**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

JUSTIN RIDDLE,
Plaintiff,
v.
OMAHA PUBLIC SCHOOLS,
Defendant.

Civil Action No.

**COMPLAINT AND BRIEF IN SUPPORT FOR VIOLATION OF PLAINTIFF'S FIRST AMENDMENT AND DUE PROCESS RIGHTS**

**I. INTRODUCTION**

1. Plaintiff Justin Riddle brings this civil rights action under 42 U.S.C. § 1983 seeking redress for Defendant Omaha Public Schools' violation of his First Amendment right to free speech and Fourteenth Amendment right to due process. As detailed below, Defendant engaged in an extensive pattern of unconstitutional conduct to retaliate against and silence Plaintiff's dissenting speech criticizing Defendant's policies, curriculum, and governance.

2. Plaintiff brings this complaint pro se as a non-lawyer without formal legal training. He respectfully asks the Court to construe his complaint liberally per Haines v. Kerner, 404 U.S. 519 (1972) and apologize for any inadvertent procedural errors given his lack of expertise. Plaintiff seeks the Court's guidance in remedying any substantive or procedural pleading deficiencies identified.

**II. PARTIES**

3. Plaintiff Justin Riddle is a resident of Omaha, a concerned parent of a 3-year-old nonverbal autistic child and a high school student within the Omaha Public School system, and an active participant in school board meetings of Defendant Omaha Public Schools. He also attended himself, and graduated two other children from Omaha public schools.

4. Defendant Omaha Public Schools is a public school district located in Omaha, Nebraska.

**III. JURISDICTION AND VENUE**

**IV. FACTUAL ALLEGATIONS**

5. In early 2021, Plaintiff became aware of the nationwide implementation of critical race theory and related controversial programs in public schools. Upon investigating Omaha Public Schools, Plaintiff discovered substantial evidence that the district had covertly introduced similar ideology and curriculum through a program called the "Inclusion Cohort," part of a broader equity initiative named #c3. The Inclusion Cohort featured messaging from Barry Thomas, the

then-Director of Equity and Diversity, indicating Omaha Public Schools was promoting concepts related to critical race theory without transparently informing parents. To present his findings, Plaintiff began attending Omaha Public Schools board meetings accompanied by his mother, a retired 30-year teacher in the district. On numerous occasions, Plaintiff attended Omaha Public School board meetings and attempted to engage in protected speech criticizing Defendant's controversial critical race theory curriculum, equity programs, alleged Open Meetings Act violations, and other issues of public concern,in particular the verbiage and messaging of Barry Thomas, the Director of Equity and Diversity for Omaha Public Schools at the time. https://www.charterwestbank.com/wp-content/uploads/2023/08/Barry-Thomas-on-Race-Social-Justice-in-the-U.S.mp4

6. However, Defendant repeatedly restricted Plaintiff's ability to speak at board meetings by abruptly cutting off his microphone, having police forcibly remove him, and obtaining a baseless emergency protection order following his criticism.

7. In the first circumstance, the plaintiff's mother first went to speak at the platform and did NOT give her address and was initially allowed to speak, however her microphone was subsequently cut off when she attempted to play his statements that the district was intending on keeping silent. https://youtu.be/vSXHOiOIUWw?feature=shared

8. Notably at the first meeting Riddle attended at the, officials requested but did not require that all speakers provide their home addresses before commenting, and no up front mention of the rule was given. However, during the proceedings:, the introduction at Mr Riddle's first meeting was as follows: Shavana Holman states: "**moving on to public comment we have 13 speakers who have submitted request of speak forms the board has adopted policy 8346 which provides public comment for a period of 1 hour that same policy limits individual speakers to a maximum of 5 minutes we ask that you respect that time limit Mr Ray will let you know when you have 1 minute remaining and when you have 30 seconds remaining given the number of speakers we ask that to the extent you are able you keep your comments brief so that we can hear from as many as you as possible in the allotted time if you're in need of an interpreter please let Mr Ray know and one will be provided for you we ask that you respect the opinions of all who speak and that you refrain from Applause or other outbursts during the presentations if the subject of your public comment is related to a particular student or staff member we ask that you not mention the student or staff member by name and instead provide that information to Mr Ray he will assist us into looking to those types of specifics for you if you do not get an opportunity to speak and would like to submit any written commentary please provide it to Mr Ray he will make sure each member of the board gets a copy as a reminder we ask that you please spell your name and state your address before you begin your public comment it is now 6:49 p.m.**"

- Speaker Cheryl Adamson and a second Speaker were both permitted to provide extended remarks without disclosing their addresses, prior to Mr Riddle being prevented.

- No objection or rule enforcement from officials was made during these first two speakers' comments, however when Mrs. Adamson started playing the audio of Barry Thomas, her microphone was shut off and she was told she could not play the district produced audio. Mr Riddle went to help, thinking it was a phone issue, but they were quickly forced to sit down, and not play the audio. Plaintiff had signed up in order, so he should have been after his mom, however, in the background you can hear Holman saying "Oh my god. I'm not letting this guy go next". She proceeded to call several other speakers before Riddle.

- Plaintiff then refused to provide his address because he viewed it as a measure the district uses to chill speech, and was not instructed before his attempt to speak, only after.

- Immediately following these critical comments from Plaintiff, Shavana Holman selectively invoked the address disclosure request that had not been enforced earlier.

- Despite no issues with the prior speakers, officials prohibited Plaintiff from continuing and silenced Plaintiff's microphone without justification.

- At no point had officials announced or established that the address disclosure request would be arbitrarily enforced only on certain speakers.

https://youtu.be/4pSeUjgmulo

 In the instance of the public meeting, there appears to have been a selective enforcement of rules regarding address disclosure for speakers. This selective enforcement, especially as it was imposed immediately after critical comments were made by a participant, raises significant concerns regarding viewpoint discrimination and a potential violation of First Amendment rights. The application of rules governing public comment must be consistent and viewpoint-neutral to uphold the principles of free expression and equal treatment under the law. The arbitrary enforcement of such rules, particularly in a manner that appears to target or silence certain viewpoints, stands in potential violation of these constitutional protections, as established by precedents in First Amendment jurisprudence.

Additionally, there was no mention of the later stated rule regarding approaching the Board table, however after that first meeting (that Riddle attended), both those items were clearly stated at the beginning of each meeting and Riddle did not violate either rule after being informed about them.

When Riddle spoke after his microphone was shut off, he was professing the very facts that the school board had stopped his mom from playing just moments before, and when Holman spoke over him, he turned around from the podium and pleaded his case that he should not be silenced.

Mr Riddle made no aggressive gestures, and in fact kept his hands behind his lower back to indicate he was not posing a threat. Regardless of the fact that he wasn't told this information about addresses and the rules of approach up front, Holman had him removed from the meeting in an effort to prevent exposure of their own Director of Equity and Diversity.

9. Defendant also barred Plaintiff's access to the board's official social media accounts after he expressed dissenting views. Cheryl Logan, superintendent, Barry Thomas, Director of Equity and Diversity, and Shavana Holman, board President, all blocked Mr Riddle on their official OPS accounts, despite Mr Riddle not using abusive, foul or untruthful speech. This prevented the Plaintiff from participating in the activities and information from the highest members of the District. This was not by accident, as Riddle did not hide his identity from them, which is evident by their own admission that the district officers were reviewing his messages. No mere accident could have caused this simultaneous coordinated blocking if Riddle.

10. Most disturbingly, Defendant conspired with the Omaha Police Department to intimidate Plaintiff through multiple phone calls and investigations in retaliation for his speech. Included in this complaint is a call from Lt Charles Otto, the head of the School resource officers for OPS. As you will see, Otto (a Lt in the police who's entire job is to manage the police Omaha Public Schools has inside their programs), agrees that Riddle has done nothing wrong, but only days after this phone call and Otto identifying Riddle as the leader of the parents resisting the hidden agenda and not a threat, Shavana Holman filed a restraining order against. Otto refused to testify on behalf of Riddle. A protection order was granted, despite the lack of proper evidence, presentation or legal standards. Again, as the head of the School Resource officers, this was no mere unrelated police action, but a deliberate and coordinated effort to silence the plaintiff, as well as others who spoke critically of the school board. Multiple people will testify to the fact that the police and in some cases actual school board members, reached out to them or their employers for opposing CRT, Mask Mandates, etc.

-This prevents due process that neither of the police officers were willing to testify when Riddle asked.

-This defies the notion that Riddle was actually dangerous in any way, because neither of the officers involved were willing to testify.

-The District supporting a restraining order against Riddle but not requiring the school resource officers who had intimate knowledge of the situation to show up and testify, ignores the premise of having needed their involvement in the first place.

-The proximity of mere days between the call from Otto identifying Riddle as a leader of parents trying to make public the information and the restraining order, leave no doubt that if Omaha Public Schools sincerely believed Riddle was a threat, they would have required their own school resource officers to be present.

- The fact that Holman waited three full weeks in an effort to allow two different officers to try and intimidate Riddle into silence, and only after that failed, decided to show tremendous fear for Riddle and only then get a restraining order, defies logic. She never indicated a fear prior to the request and had been in the presence of Riddle's and others. She didn't express concern for her personal safety to any of the other nine board members, and she didn't want the very officers employed for these types of situations to testify on her behalf.

-Additionally, an email from Riddle suggested metaphorical "termination and Leprosy" and Holman claimed that by termination, he intended on physical harm, ignoring that when taken literally, she would also have to truly believe that he could cast an ancient disease on her post mortem. Obviously, this makes no rational sense, but was used to show tremendous fear in the dishonest hearing that the Officers refused to testify at.

This demonstrates an escalated level of intimidation and suppression used by the district, in an effort to conceal the information that Riddle was presenting. This behavior is not reserved solely for Riddle, but other concerned citizens are facing similar, although less egregious, retaliation such as calls from the school district to their employers.

11. Plaintiff has extensive evidence corroborating these violations, including video recordings, recorded phone calls, screenshots, and witnesses.

12. Defendant's actions were a direct attempt to chill dissent and retaliate against Plaintiff for his protected speech on matters of public concern.

V. FIRST AMENDMENT VIOLATIONS

13. The First Amendment prohibits government entities like Defendant from abridging citizens' right to free speech on matters of public concern. See Citizens United v. FEC, 558 U.S. 310 (2010).

14. Viewpoint-based restrictions on core First Amendment speech in traditional public forums like school board meetings are presumptively unconstitutional and subject to strict scrutiny. See Minnesota Voters All. v. Mansky, 138 S. Ct. 1876 (2018); Victory Through Jesus Sports Ministry v. Lee's Summit R-7 Sch. Dist., 640 F.3d 329 (8th Cir. 2022).

15. Here, Defendant repeatedly violated Plaintiff's free speech rights:

a. By barring Plaintiff from speaking at board meetings through means like cutting his microphone, removing him, and obtaining a baseless protection order - all retaliatory restrictions on participating in a public forum.

b. By excluding Plaintiff from the board's official social media accounts after posting dissenting views, thereby blocking his access to a digital public forum.

c. Most disturbingly, by chilling Plaintiff's speech through police intimidation tactics like unwarranted home visits specifically aimed at deterring his criticism. See Okwedy v. Molinari, 333 F.3d 339 (2d Cir. 2003) (targeted police harassment of a critic violated First Amendment).

d. This was not isolated to just Riddle, as the call with Otto acknowledged that they went to search a student's house for merely showing up, not even speaking, at the meeting and sitting by Riddle. You will see in great detail that Otto could not illustrate a reason to justify the actions as follows: "**Riddle - I've requested specifically how many people they've had that have been either CPS has been called you guys have been called the the health and wellness safety team of Omaha has been called in the last 24 months because they've brought up CRT or these types of issues because you and I both know that the fact that they silenced me at the board the fact that they're pushing to get cops to go you know search kids house high school kids house this is the school board**

**Otto- my prior assignment before being um involved with the school resource officers was I was in charge of the assault unit and if there were um that's pretty standard**

**-not in this case not not in this case there's a common link there and there's absolutely nothing I've said in any way shape or form whatsoever that anybody could misconstrue unless they just were like when when when they say there's something big on Monday well you know what it is and I know what it is it's a big crowd it's a bunch of people a a teenager doesn't need to think that by saying that there's something big that all of a sudden he's going to have the cops coming to his house harassing him and I**

**-I mean I did I'll take issue with the word harassment because first I I thought I had a very cordial conversation**

**- but didn't you ask to search his room**

**-yeah**

**-that's harassment**

**-that's not harassment**

**-what grounds did you have to ask to search his room what grounds at all what what SP What specifically**

**-that's a standard thing that we will do**

**-just just go search people's rooms**

**-sir, harassment would be demanding to search, I asked**

-well you have to ask you can't demand it's illegal but even asking to search his room with no valid reason is harassment

-no it's not

-what reason did you have to ask to search his room what were you hoping to find

-we'll have to agree to disagree

-okay but what were you hoping to find

-I wasn't hoping to find anything

-so why would you be looking what were you looking for you can't just go search somebody's room without having something you're looking for isn't that the law

-no

-what's the law

-it's called consent of search

-and what would you be searching for

-well sir um this is getting well

-I'm just asking I'm seriously just asking I'm trying to understand because when I talk to my attorney in the morning I just need to understand what to tell him actually went on and when he says we'll what were they what was the reason for the search and I say we'll he said there would be a big event or something big on Monday and that was so pervasive they felt that the cops should go by and search his house I I don't want to say that to him but this is what I'm hearing

-oh there's nothing wrong with you saying that to him

-but is that fair

-is what fair

-was was there something you were looking for

-sir that is a normal investigative technique when you are investigating potential threats

-and what what was the Potential Threat

**-that I'm not going to discuss at this time**

**-but apparently I'm involved because my name was brought up**

**-Yes"**

16. Defendant lacks a compelling interest that could justify these blatant infringements on Plaintiff's protected political speech regarding Defendant's policies, curriculum, governance and other matters of public concern. Additionally, Plaintiff and multiple other members of the community have submitted repeated requests for various types of information, including details on programs, decision making, people sampled, policy changes, etc. To date, the plaintiff can demonstrate that the school district has NEVER responded to any of the questions asked by himself and several other people. This then eliminates proper discussion in public, while avoiding the facts in private. As such, the original questions about Critical Race Theory and the #c3 initiatives led by the "Inclusion Cohort", have never been answered. This pattern of hiding the truth and decision making process is not just bad form, it's a complete abuse of public trust and confidence.

17. Defendant's pattern of viewpoint discrimination imposed unconstitutional restrictions on Plaintiff's core First Amendment rights.

VI. DUE PROCESS VIOLATIONS

18. The Fourteenth Amendment prohibits depriving individuals of liberties without due process. See Mathews v. Eldridge, 424 U.S. 319 (1976).

19. Here, Defendant completely denied Plaintiff due process by swiftly obtaining a baseless emergency protection order as retaliation for his speech, enabling seizure of his firearms without any notice or opportunity to refute the false allegations. The head School resource officer Charles Otto, heard in this call, refused to testify at the Order for Protection hearing, when asked by the plaintiff.
https://www.charterwestbank.com/wp-content/uploads/2023/08/Omaha-Police-Call-2023_08_21_13_33_10.mp3
https://www.charterwestbank.com/wp-content/uploads/2023/08/Omaha-Police-part-2-2023_08_21_13_38_26-1.mp3
https://www.charterwestbank.com/wp-content/uploads/2023/12/Justin-Riddle-request-witness-1.jpg

VII. CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

20. Moreover, Defendant conspired with police to intimidate and retaliate against Plaintiff and others through joint actions like unwarranted home visits, phone calls and the unlawful ex parte order depriving Plaintiff's rights - all in an effort to silence protected speech.

21. These coordinated abuses of power exhibit a conspiracy to trample Plaintiff's First Amendment and due process rights. There can be no accidental link between the actions of the Police, School Board and District representatives, as they are all necessarily intertwined by design. No outside forces prompted two separate Omaha Public School Resource Officers to call Riddle for speaking truthfully and calmly at the meetings.

22. Defendant's campaign to silence dissent violated Plaintiff's most sacred constitutional protections. By using the overwhelming power imbalance of the combined control of the meetings, narratives and law enforcement, Omaha Public Schools has demonstrated significant disregard of not just public trust, but also of federal laws.

VIII. IRREPARABLE HARM

23. Plaintiff has suffered and continues to suffer irreparable harm through the deprivation of his First Amendment rights and chilling effect on his speech. This harm cannot be compensated adequately through damages alone and requires injunctive relief to prevent ongoing violations.

IX. REQUESTS FOR RELIEF

\*\*\*When looking at the established, uncontested facts that were stated on the call with Charles Otto, several things are undisputed, and require discovery to root out the reasoning.

- Otto was not the first, but second officer to call Riddle. At the time of this call, Otto was aware that officer Steve Lee of the Omaha Police Department Emotional Health and Wellness division, had already called Riddle two weeks prior, and admitted that Riddle was not a concern in any way.

- Otto acknowledged several times that Riddle was not only well within his rights, but had made necessary adjustments "*um I don't think you know I don't have any issues with anything you've done in fact I I want to compliment you at the meeting on Monday night um no I saw what happened two weeks ago and then I saw what happened Monday and I thought you handled yourself quite well and I didn't see a problem at all*"

- This statement from Otto is important for several reasons:

First, Otto admits that he is aware Riddle has already been evaluated by officer Steve Lee, on behalf of the School board, and had been determined to be a normal person, with real, valid, documented and illustrated concerns. More disturbingly, he also admits that not one, but two officers showed up at a students house for merely showing up (not even speaking) at the meeting, but sitting by Riddle. Although asked repeatedly by Riddle why they would go to such

measures, Otto had no explanation. This shows a serious pattern of OPS and OPD harassment, in an effort to chill speech and prevent the public from seeing the facts. There are other people who will testify to the same.

Second, Otto admits that he saw a clear effort on the part of Riddle to follow the Rules, and wanted to compliment him. This directly defies the logic of needing to call Riddle at all. Cops don't routinely call people who spoke at public meetings just to compliment them. Similarly in this situation, the compliment was a veiled attempt to gather information for the school board.

Third, from the first meeting where Riddle was silenced, three weeks and two calls from the Police had transpired, and when Otto established that Riddle was the leader, only THEN did the district pursue more aggressive means to silence him through a protection order. Riddle aptly predicted that OPS would increase their aggressive behavior in this call with Otto. And in fact, was soon proven correct.

Fourth, the District waited three weeks and until two officers had unsuccessfully attempted to intimidate and chill Riddle's speech, before taking even more extreme measures to silence criticism.

Fifth, the mere fact that a protection order was requested, but the two officers tasked with evaluation of threats, were involved with Riddle, but not required to be at the hearing, defies the fundamental reason for their involvement, and denied Riddle a fair hearing, in a situation completely contrived by Omaha Public Schools to prevent Riddle from exposing the very real truth about their planned curriculum.

Finally, there is no dispute that although the subjects of the new curriculum that Riddle had questioned (Barry Thomas and Cheryl Logan), have now abruptly (and without clear reasons) resigned. Unfortunately, dozens of questions from dozens of speakers have been turned in and promptly ignored over the last several years. The mechanism of ignoring questions through intimidation and ignoring, must be addressed. As elected officials, the ability to avoid every uncomfortable question for years on end, can not be tolerated in the Public School Environment, in particular through such serious and aggressive behavior.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendant violated Plaintiff's First Amendment and due process rights;

B. Issue a broad injunction prohibiting Defendant from further infringing on Plaintiff's constitutional rights, to include regular unbiased reviews of community integration and involvement, and requiring the Board to answer future questions from the public in a clear, tracked, easily accessible manner;

C. Award compensatory damages in the amount of $250,000 for the emotional distress, reputational harm, and other injuries suffered due to Defendant's unlawful actions;

D. Award punitive damages in the amount of $750,000 to deter future egregious violations of constitutional rights by Defendant;

E. Award minimal damages in the amount of $1,000 for Defendant's violation of Plaintiff's civil rights;

F. Grant Plaintiff reasonable costs and expenses for this action;

G. Grant any other relief this Court deems just and proper.

X. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable. Justice CANNOT be served if the facts in this situation are not allowed to be explored. The overwhelming evidence requires context only available in discovery or MUST be taken as true. No mere response to this filing would suffice.

Respectfully submitted,
Justin Riddle
Pro Se Litigant
402-813-2156
16422 Patrick Ave
Omaha, NE
68116

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Justin E. Riddle

### DEFENDANTS
Omaha Public Schools

**(b)** County of Residence of First Listed Plaintiff: Douglas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Douglas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se

Attorneys *(If Known)*
Baird Holm

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CIVIL RIGHTS**
- [x] 440 Other Civil Rights

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause: Civil Rights violations

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ See Complaint

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE _____ SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____