IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JUSTIN RIDDLE,

Plaintiff,

v.

OMAHA PUBLIC SCHOOLS,
Defendant.

Case No. 8:23-cv-00547

PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Justin Riddle respectfully submits this Brief in Opposition to Defendant Omaha Public Schools' Motion to Dismiss. For the reasons stated below, Defendant's Motion should be denied in its entirety.

Based on the facts alleged in the complaint and subsequent information revealed, for the court to grant the school district's motion to dismiss, it would effectively require believing the following from the school's perspective:

- The police contacts with Mr. Riddle, including the late night with Lt. Ott, were completely routine and not intended to intimidate or dissuade Mr. Riddle from his criticism of the district. This would ignore that Ott specified multiple times that his concern was for safety at the SCHOOL BOARD MEETING.

- Lt. Ott and the police acted independently without any coordination with or influence from the school district in monitoring and contacting Mr. Riddle. This would ignore that Ott admits to being notified of Riddle's removal from the meeting by an unknown Co-Conspirator.

- The school board's indemnification of Dr. Holman was purely routine and not evidence of the district's involvement in the protection order against Mr. Riddle. This would ignore that every single board member received the same emails from Riddle, and attended the same meetings as Holman, but had no personal safety concerns (also evident by the fact that none of them showed up to the hearing), yet chose to support Holman.

-From the school board meeting ***I.23. Indemnification of Dr. Shavonna Holman pursuant to Nebraska Revised Statute section 79-516(1)
Rationale:  In keeping with the provisions of Nebraska Revised Statute section 79-516(1), the Administration recommends that the Board of Education indemnify Dr. Shavonna Holman against expenses she has incurred or may incur in connection with a protective order pending in

the County Court of Douglas County, Nebraska arising out of her role as a member of the Board of Education.  The Administration further recommends that the Board determine that indemnification of Dr. Holman is proper in the circumstances because she acted in good faith and in a manner which she reasonably believed to be in or not opposed to the best interests of the school district.  The Administration recommends that District's General Counsel be authorized to engage outside counsel to provide the legal services related to such pending action, suit, or proceeding involving Dr. Holman.

"**okay moving on now to the consent agenda is there a motion so moved so moved is there a second second okay there is a motion by Miss Snipes and a second by Mr head I will be abstaining from um uh item sorry I don't even have it ready yet one second no I need to abstain my apologies for that I will be abstaining from item i23 roll call Mr Ray**": Snow "I" Theilen "I" Cassidy "I" Erenberger "I" Head "I" Holman "I" Kratky "I" Smith "I" Snipes "I"..... MOTION CARRIES, THANK YOU.***

- Lt. Ott had no useful relevant testimony to provide at the protection order hearing and his refusal to testify despite his prior involvement was innocuous. This ignores that the entire point of his conversation was to assess the situation regarding the attendance of the school board meeting.

- The timing of the police calls, protection order, and Mr. Riddle's vocal criticism of the district was completely coincidental. This ignores that Riddle has never been called or approached by law enforcement for anything of the kind, ever, before his attendance.

- Mr. Riddle's First Amendment activities were not actually chilled, as evidenced by his continued participation in board meetings. This ignores that Riddle is clearly aware of his rights, something that many people are not, and indicates that because he did not succumb to the intimidation, no violations occurred. It also ignores that after the restraining order, out of fear of continued harassment, Riddle only attended two additional meetings before self preservation caused him to stop attending for over two years.

- The limited contacts alleged do not amount to an actionable constitutional violation as a matter of law. This would require accepting that "if only two police officers contacted each parent that spoke against the school district's loose interpretations of Education, that would be acceptable".

In essence, granting the motion to dismiss would require viewing all of the allegations and coincidences as innocuous and uncompelling, rather than inferring retaliation based on the totality of the circumstances. It would demand an exceedingly charitable interpretation of the district's actions rather than acknowledging a plausible narrative of retaliation.

When looking at all the evidence and allegations in context, the school district's explanations do seem to strain credibility. Expecting the court to ignore or accept dubious explanations for:

- Repeated police contacts targeting Mr. Riddle's protected speech

- The indemnification of Dr. Holman for a personal protection order matter
- The refusal of Lt. Ott and Officer Lee to testify after speaking extensively to Mr. Riddle
- The overall timeline and coincidence of events

requires giving the school district the strong benefit of the doubt on multiple fronts.

On the other hand, Mr. Riddle's narrative presents a coherent and compelling story of coordinated retaliation for his criticism of the district.

The coinciding events, relationship between the parties, and apparent motives make retaliation a natural and logical inference. Ignoring that would require ignoring common sense and human nature. The totality of the circumstances renders the school district's innocent explanations quite dubious.

While courts must construe facts in the defendant's favor on a motion to dismiss, they need not abandon reason or common experience. Here, Mr. Riddle has alleged more than enough corroborating facts to nudge his claims from conceivable to plausible, even probable and likely.

Dismissal would essentially require turning a blind eye to an obvious evidence supported narrative. Therefore, the evidence strongly weighs against dismissal when objectively viewed as a whole.

Based on the facts and evidence presented in the complaint, the school district's motion to dismiss seems to take a very optimistic view of the allegations that strains credibility. A few key points:

- The motion attempts to downplay and isolate the police contacts, indemnification, and protection order as minor incidents that are routine and innocuous. But viewed collectively, they paint a very different picture.

- The citations on municipal liability under §1983 are clearly misapplied to the facts here, which allege much more than an isolated incident by a rogue employee.

- The standards articulated for a conspiracy claim or chilling of speech are a selective stretch to avoid what appears obvious retaliation.

- The arguments rely heavily on narrow technicalities in the law rather than addressing the compelling common sense inferences from the timeline and links between the parties.

Overall, the school district's motion is an attempt to interpret the law as favorably as possible while downplaying or ignoring any inconvenient facts. The arguments come across as grasping at straws to justify dismissal on a technicality rather than substantively engaging with the allegations.

While lawyers must make all reasonable arguments for their client, the motion seems to take liberties in portraying a highly skeptical view of Mr. Riddle's claims. As you read it, it often feels more akin to throwing legal citations against the wall to see what might stick rather than a cohesive rebuttal anchored in the alleged facts and conduct. But the facts matter, and their overall weight here undermines the school district's positions when viewed objectively.

Based on the transcript from the original call included in the complaint, some inappropriate questions the officer asked include:

- Asking who the anonymous Twitter users are that Riddle is communicating with. Riddle rightly refuses to provide their identities.

- Asking if the student Jaden had any friends at the meeting. Again, Riddle refuses to provide any names.

- Asking Riddle to identify a specific student at the meeting based on a physical description. Riddle says he does not know who the officer is talking about.

- Asking what Riddle and others are planning for the upcoming meeting, trying to determine if they plan any disruptions or violence. Riddle insists their plans are peaceful.

- Asking Riddle to point out anyone at the upcoming meeting who seems disruptive or aggressive, even though he acknowledges they have a right to be there.

- Asking Riddle to contact him about concerns related to future meetings, which could be seen as trying to monitor their activities.

Overall, the officer seems to be probing for information on identities, plans, and activities in a way that could be considered overreach or inappropriate prying given this is related to a school board meeting and expressing free speech.

In addition to the fact that Holman voted for her own indemnification (also known as the school taking an active position against Riddle), now they are claiming that the School District was separate from a situation that they Voted, funded, and represented.  Additionally contained in the phone calls in my complaint, are the following quotes.

1. Ott. "yeah and I'm not saying and understand that some of these things come you know these things come to light and **it isn't necessarily from us, you know from from the school district**"


2. Ott. "So um I guess I'm not I'm sorry you copy I'm got a splitting headache I I don't even remember saying a statement to anybody today about that but if I did yeah I would like to talk to you at some point um I don't think you know I don't have any issues with anything you've done

in fact I I want to compliment you at the meeting on Monday night um **no I saw what happened two weeks ago and then I saw what happened Monday** and I thought you handled yourself quite well and I didn't see a problem at all"

3. Ott. "um or I actually I do have more questions but I want to tell you something sure I I saw on YouTube because **I was notified that you were removed** I watched the whole thing was that I'm just curious it doesn't matter was the"

Riddle. "that was my mom"

4. Ott. "you obviously have issues you have personal issues with the Omaha Public schools"

Riddle. "I have no personal issue with them"

Ott. "well not concerns you have things that **you had email conversations with them**"

Riddle. "absolutely"

5. Ott. "**and leading up to this next one I don't know if it was because I mentioned it or if someone else I just mentioned said look you should really quote give the statute quote it and explain it before you before he asks for allow public comments**"

These leave no doubt that the Police and School district were acting together, as there is no question that Ott is acting under instruction from the district.

He acknowledged that he was notified about several issues. The removal from the meeting he didn't attend, information regarding the emails he wasn't sent which (would include the emails used against Riddle at the hearing, meaning AFTER viewing the email used by Holman in Court, he didn't bring up that Riddle had said ANYTHING wrong), the fact that the Board did not announce the address issues properly, etc.

This bases the response on simple, easily disproved lies that hinge on OPS being a disinterested party and their hear SRO being independent of their influence.

Neither of these things can be true.

While the defendant argues that the incidents alleged represent isolated occurrences rather than an official policy or custom under Monell, the complaint sufficiently alleges facts showing an unofficial policy or custom of unconstitutional conduct. Specifically, the complaint alleges that police officers conducted intimidating home visits and unwarranted investigations against critics of the school district, including visiting a student's home simply because he attended a meeting and sat near the plaintiff.

Even in the absence of an expressly adopted written policy authorizing such practices(which, of course, would never exist), these actions collectively demonstrate a tacitly authorized unofficial custom and pattern of retaliatory intimidation aimed at chilling protected First Amendment activity. The complaint alleges the school district was deliberately indifferent to this pattern of misconduct, as evidenced by its failure to stop these retaliatory practices.

When viewed in their totality, the allegations regarding unwarranted home visits, obtaining questionable emergency protection orders, and selectively preventing speech at board meetings plausibly establish an unofficial policy or custom under Monell. Isolated incidents alone may not prove an unconstitutional custom, but the complaint here contains sufficient factual allegations that, when assumed true, allow a reasonable inference of an unconstitutional pattern of conduct tacitly ratified by policymakers.

Municipal Liability Under § 1983

Plaintiff has sufficiently alleged an unconstitutional custom or policy under the standard articulated in Monell and its progeny. The complaint contains specific factual allegations that OPS policymakers, including the School Board and Superintendent, directly participated in or tacitly authorized the alleged constitutional violations through their actions and deliberate indifference. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (policymakers can create official policy with even a single decision or act); Ulrich v. Pope County, 715 F.3d 1054, 1061 (8th Cir. 2013) (repeated failure to respond to complaints helped prove deliberate indifference). For example, the School Board's decision to indemnify and represent Dr. Holman in seeking the questionable protection order against Plaintiff could by itself constitute an official policy endorsing retaliation under Pembaur. The numerous unanswered information requests further support deliberate indifference under Ulrich. These circumstances distinguish this case from an isolated rogue employee acting alone.

-For the proper objective standard, See Hartman v. Moore, 547 U.S. 250, 256 (2006) (highlighting retaliation claims based on the desire to prevent speech); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002) (threats of legal action can deter persons of ordinary firmness from speaking). The questionable emergency protection order obtained without required notice or hearing represents one such act. When the totality of alleged acts are considered together, they plausibly amount to actionable retaliation under the First Amendment.

Conspiracy Under § 1983

While conclusory allegations of a conspiracy would be inadequate under White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008), the complaint contains specific factual allegations supporting a coordinated effort between OPS officials and police to silence Plaintiff in retaliation for his dissenting speech. This satisfies the requirement to plead facts showing each alleged conspirator's mutual understanding and willful participation articulated in Murray v. Lene, 595 F.3d 868, 870 (8th Cir. 2010). For instance, Plaintiff alleges the School Board conspired with

police by linking their discussion of his emails, which they could not have seen, and their admitted monitoring of his activities before the Board meetings where he spoke.

I. Plaintiff Has Sufficiently Alleged an Unconstitutional Custom or Policy of Viewpoint Discrimination

Plaintiff has sufficiently pled facts alleging Omaha Public Schools engaged in an unwritten custom and policy of viewpoint discrimination that caused violations of Plaintiff's First and Fourteenth Amendment rights. Specifically, Plaintiff alleges a pattern of coordinated suppression by multiple OPS officials, including school board members, school resource officers, and the superintendent. Their actions to silence Plaintiff's dissenting speech, such as abruptly cutting off his microphone, removing him from meetings, blocking him on social media, and obtaining a questionable protection order, plausibly establish a pervasive unwritten custom and practice of discrimination followed with tacit approval of policymakers. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978) (municipal liability under § 1983 requires an unconstitutional action resulting from an official policy or custom); Adickes v. S. H. Kress & Co., 398 U.S. 144, 167-68 (1970) (existence of an invidious custom or usage followed by state officials can support § 1983 liability).

Most importantly, the OPS Board's decision to indemnify and represent Dr. Holman directly contradicts any claims that her actions to restrict Plaintiff's speech were unrelated to OPS. The District's ratification and sanctioning of Dr. Holman's conduct confirms it was pursuant to OPS custom and policy. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (policymakers' approval of subordinate's decision suggests it conformed to official policy).

The alleged pattern of suppressing dissenting viewpoints, if proven, would violate the First Amendment prohibition on viewpoint discrimination by the government. See Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional").


II. Plaintiff Has Sufficiently Alleged Deliberate Indifference

Plaintiff also alleges numerous unanswered information requests submitted to OPS by him and others seeking transparency about the District's controversial equity programs and decision-making – which OPS does not dispute. The sustained failure to provide any meaningful responses about alleged viewpoint discrimination could plausibly demonstrate deliberate indifference and tacit authorization by OPS policymakers. See Canton v. Harris, 489 U.S. 378, 390 (1989) (municipal liability may attach where policymakers exhibit deliberate indifference to constitutional violations); Cash v. Cnty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (repeated failure to respond to complaints may amount to deliberate indifference).

A policymaker's choice to not act despite notice of unconstitutional conduct can reflect deliberate indifference and a policy or custom of condoning the violations. See Connick v.

Thompson, 563 U.S. 51, 61-62 (2011) (liability based on failure to act requires showing of deliberate indifference); Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (policymaker's inaction in response to complaints can constitute deliberate indifference). The numerous unanswered information requests could establish OPS's knowledge yet indifference to ongoing viewpoint discrimination.

III. Plaintiff Has Standing to Present Evidence of a Broader Pattern of Suppression

Plaintiff has standing to present evidence of similar constitutional violations suffered by third parties, not to seek relief for their harms, but to further illustrate the alleged broader pattern of suppressing particular viewpoints at OPS. See Covenant Media of SC, LLC v. City of N. Charleston, 493 F.3d 421, 429 (4th Cir. 2007) (evidence of third-party experiences may be used to bolster claim of an unconstitutional policy or custom); Thomas v. City of New York, 293 F. Supp. 3d 422, 434 (S.D.N.Y. 2018) (same).

Standing requires a plaintiff to have personally suffered an actual or imminent injury, fairly traceable to the defendant's conduct, that a favorable court decision would likely redress. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (reciting standard three-part standing test). Plaintiff satisfies Article III's standing requirements by alleging OPS violated his own First Amendment rights. Evidence of other potentially unconstitutional viewpoint restrictions simply helps substantiate the alleged policy, practice, or custom.

IV. The Acts Alleged Could Plausibly Deter an Ordinary Citizen from Speaking Out

The Complaint satisfies the proper objective legal test for adverse actions that would deter ordinary citizens from speaking out. Plaintiff alleges intimidation tactics like unwarranted home visits by the school resource officer, who is necessarily connected to OPS, not a wholly separate entity. The alleged sham protection order obtained on false pretenses could also deter speech. Actual deterrence of Plaintiff specifically is not the standard.

To plead a First Amendment retaliation claim, a plaintiff must allege conduct that would likely deter "a person of ordinary firmness" from exercising their right to free speech. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005); see also Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) (adopting "ordinary person" standard for adverse actions). The test is objective, not subjective. Balt. Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006). A chilling effect on future First Amendment activities can constitute injury. See White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000). Plaintiff has plausibly alleged retaliation imposing harms that would likely deter ordinary citizens from voicing dissent.

The alleged coordinated actions by the School Board, administration, and police aimed at deterring Plaintiff's protected speech at Board meetings constitute adverse conduct that would chill the speech of ordinary citizens under the proper objective standard. See Hartman v. Moore, 547 U.S. 250, 256 (2006) (highlighting retaliation claims based on the desire to prevent speech); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002) (threats of legal action can deter persons of

ordinary firmness from speaking). The questionable emergency protection order obtained without required notice or hearing represents one such act. When the totality of alleged acts are considered together, they plausibly amount to actionable retaliation under the First Amendment.

In summary, when taken at face value, there can be no denial of coordination when the following quotes are considered from the call between Riddle and Ott:

Ott. "um I don't think you know I don't have any issues with anything you've done in fact I I want to compliment you at the meeting on Monday night um no I saw what happened two weeks ago and then I saw what happened Monday and I thought you handled yourself quite well and I didn't see a problem at all"

Riddle. "brought it up at the meeting on Monday and his dad got a call before we got before he got home that is targeted harassment and it's not your fault"

Ott. "who do you get them just out of curiosity"

Riddle. "if you I I don't I guess I don't know I figured it was you guys because they were police whoever they were"

Ott. "um on on Monday during like during the meeting"

Riddle. "yep"

Ott. "during the meeting oh I can tell you where I was I'm exactly where I was where was where I am right now"

Riddle. "it may have been a guy could have been that Steve guy that called me or somebody but I can tell you that the fact that you don't know that is another reason that shows that they're targeting harassment towards us"

Ott. "it wasn't me or anybody who works for me I'll tell you that"

Riddle. "I appreciate that"

Ott. "so anyway my concern is some of who want to take some of the words literally I was worried about potential violence potential you know"

Riddle. "you have my word none of that is yeah that's not the case at all we're excited to have a voice"

Ott. "you've you've spoke you have explained to really his name was Lee you explained yourself to him and you've explained yourself to me and like I said I watched your demeanor how you conducted yourself on Monday"

This leaves open the following questions that can't be ignored:

1. Who is Steve Lee, who notified him about Riddle and why would the department of Health and Mental Wellness be calling Riddle for providing a factual claim at a school board meeting.

2. How did Ott know about Riddle? He admits that he was not there, but was told. Who told him?

3. How was Ott unaware of the fact that a student's parent was called, yet visited that student's house. Additionally, considering he was not aware, who called that student's house?

4. Who did Ott report his findings to? He was notified about emails, which could have only happened from someone who received them, which would include the entire board, Cheryl Logan and Barry Thomas. But who did he report his findings to?

5. Absent coordination, how did Ott know that Steve Lee had contacted Riddle, and how was he aware that as far as Lee was concerned, Riddle was not a threat?

6. If the School Board unanimously (including Holman herself) voted to indemnify Holman, why did ZERO of them show up to support her and testify? Additionally, why didn't the Officers show up and testify, despite Riddle asking?

If the minimum criteria for the allegations set forth are not met, despite the clear and uncontested statements from the officers and board members themselves, the criteria must legal be ratified to exclude the current requirements.

The school district/board/administration can not claim that there was no coordination between themselves and the SRO and police, because the only way Ott could have known about the emails, is from a recipient.

This proves that Ott was, in fact, acting on behalf of the school district, and no other explanation is acceptable, unless the statements from Ott were fabricated. Due to the uncontested audio recordings included in the initial filing, we must take true what the evidence shows.

The evidence does not show a random police officer called to compliment a citizen for their expected demeanor in a public setting. Rather, it shows the head of the School Resource Officers calling on instruction from some mystery, unnamed co-conspirator, to pry about names and intentions for the upcoming meeting. This, on its face, can't be ignored. Ott then states he will be at the upcoming meeting.

The defense has tried to cleverly use a legal strategy, in an effort to avoid addressing even the minimum, fundamental issue behind the complaint, which is, in fact, the complete lack of transparency within the school district.

Instead, they have decided to claim that Riddle, a concerned parent and graduate of Omaha Public Schools, was somehow the problem, despite the fact that everything he was claiming came directly from their own Director of Equity and Diversity. They knew what he was playing was real, was happening and was NOT supposed to be visible to the parents of the district. Further, they are claiming all of these actions were made independent of OPS influence, but fail to address the obvious question that presented, regarding how Ott would have notified himself of something he didn't witness.

Finally, and although not stronger evidence than what has already been presented, is the fundamental issue. The Curriculum.

Ott's statement regarding the emails subtly proves the plaintiff's claim further.

Riddle has sent multiple emails asking the same exact questions that he asked in the meetings. In addition to email and verbal, Mr Riddle, on several occasions, printed off enough copies for the entire board, and turned them in properly for distribution. Not one answer to one question has EVER been provided.

This means that instead of answering even one question of a rightfully concerned parent, the district coordinated via email, phone calls and/or in-person conversations between each other, the Superintendent and the Omaha Police Department, in a massive and swift effort to silence the questioner.

Even in the response to the complaint, they have sufficiently ignored the factual premise of the situation.

Plaintiff asks the Court to take special notice of the simple fact that as an individual in a David vs Goliath situation, it's of little wonder that most parents were dissuaded from attending. Mr. Riddle was a sole barrier to a horrible curriculum that was in fact, so toxic, they went to unbelievable lengths to hide it. Instead of protecting our children from what they knew was so bad that it had to be kept secret from parents, they chose to silence and punish everyone who tried to object. Instead of answering the questions, they called law enforcement and plotted to silence criticism.

The issues I have raised regarding the school district's handling of my complaints are painfully obvious upon review of the detailed evidence presented. The mishandling comes down to a failure to properly evaluate clear and objective documentation. A single document with a simple checkbox was ignored when Plaintiff was forced to fight and win unanimously in the Nebraska Supreme Court in 2023, just as clear recordings and timelines are now being dismissed. The parallels are undeniable.

It strains credulity to claim oversight agencies, courts, and school authorities could all improperly apply unambiguous evidence without bias against an average citizen. My previous victory at the

Supreme Court proves trained professionals can repeatedly fail to grasp basic facts and law. Once again, indifference to truth has left an informed skeptic facing institutional denial. The system prioritizes convenience over accountability.

For any reasonable observer, the facts can only lead to one conclusion - retaliation for exercising my rights. To deny what is obvious would require ignoring fundamental logic and reason. I hope in this case the truth may prevail, though experience warns powerful institutions rarely concede their misdeeds, even when caught red-handed. I present the plain evidence and pray those tasked with justice have the courage to follow where it leads.

To dismiss this based on a few well put-together words that don't matter at all in this situation, would not only be unjust, but could not be explained in any simple way, that could help prevent a future citizen like Mr. Riddle, from being targeted by a (stated, documented, uncontested and necessarily connected) group of individuals, as the evidence is black and white. Either the claims Mr Riddle has stated, including the quotes from Ott, board meetings, and audio recordings are real, or they are fake. Only if they are fake, can the defense claim no involvement by Omaha Public Schools.

Plaintiff prays for a denial of the motion to dismiss, so that the facts can be tried appropriately, in front of a jury of his peers, as provided by the law. If there's any remaining doubt, the 9th amendment allows you to accept my logical argument as true, which would also mean that my opinion of what rights have been violated, is acceptable, regardless of any unrelated, outdated, or misinterpreted legal argument provided by the defense.

It should not be understated that what the Plaintiff has done, if proven, has prevented the implementation of Critical Race Theory into the largest school district in the State of Nebraska. The resounding effects of this can not sufficiently be quantified. Throughout the nation, normal concerned parents just like Mr Riddle have been labeled as dangerous and violent, while the real danger is the hidden agenda the schools have fought so hard to hide from the public, while implementing at school.

Thank you,

Justin Riddle
402-813-2156
Pro Se Litigant
Justinriddle1@gmail.com