IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JUSTIN E. RIDDLE, | | |
| Plaintiff, | | **8:23CV547** |
| v. | | |
| OMAHA PUBLIC SCHOOLS, | | **MEMORANDUM AND ORDER** |
| Defendant. | | |

This matter is before the Court on defendant Omaha Public Schools's ("OPS") Motion to Dismiss Complaint for Failure to State a Claim and Lack of Subject Matter Jurisdiction (Filing No. 6). *See* Fed. R. Civ. P. 12(b)(1), (6). For the reasons that follow, the Court grants in part and denies in part OPS's motion.

## I.    BACKGROUND[1]

Riddle, a longtime resident of Omaha, Nebraska, has been involved in the OPS community for decades. Having graduated from OPS himself, Riddle has now raised three children who have attended OPS. Two of those children have since graduated and one still attends high school within the school system.

---

[1]At this stage, the Court "accepts as true all factual allegations in [Riddle's] complaint." *Torti v. Hoag,* 868 F.3d 666, 671 (8th Cir. 2017) (quoting *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017)). The Court generally ignores "materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as the materials that are necessarily embraced by the pleadings." *Glow in One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022) (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 (8th Cir. 2012)). To this point, the Court has reviewed the publicly-available, official video recording of the August 2, 2021, OPS Board of Education (the "board") meeting as both Riddle's complaint and OPS's brief (Filing No. 7) include hyperlinks to the recording and refer to events captured therein.

Riddle refers to himself as "an active participant in [the] school board meetings" of OPS. Among other things, he has attended board meetings to express his disagreement with OPS's equity initiatives. Riddle particularly disagrees with various ideas expressed by Barry Thomas ("Thomas"), OPS's then-Director of Equity and Diversity, which he believes demonstrate OPS is implementing controversial "critical race theory" programs "without transparently informing parents."

Riddle's complaint centers around events arising out of his attendance at one such board meeting. On August 2, 2021, Riddle attended a board meeting to express his disagreement with the alleged programs and Thomas's "messaging." Near the outset of that meeting, board member and then-president Dr. Shavonna Holman ("Holman") explained how the well-attended public comment session would proceed that day. In particular, Holman informed the audience, "We ask that you please spell your name and state your address before you begin your public comment." Though Holman did not elaborate at that time, that requirement had recently been set forth by Nebraska law and implemented by board policy. *See* Neb. Rev. Stat. § 84-1412(3); Omaha Bd. of Educ., Internal Bd. Policy 8346(E) (providing that members of the public must identify themselves and give their address unless they are OPS students or otherwise exempted "to protect their security" after giving notice on their "Request to be Heard form").

Multiple members of the public spoke before Riddle took the podium. One of those individuals was Cheryl Adamson ("Adamson"), Riddle's mother and a longtime public-school teacher. Adamson introduced herself to the OPS Board, but—when asked to give her address—she responded that "her husband wouldn't appreciate that." Adamson moved on to give her statement after clarifying to the board that she worked for the school system.

Looking down at her phone, Adamson preluded her presentation by explaining that her experience as a teacher has taught her to "be prepared, whether that is with antidotal [*sic*] notes, observation, and/or audio and visual resources," when meeting with others "to

ensure the success of each and every student." Then, holding her phone to the podium microphone, Adamson played a video of Thomas's statements. Those statements were amplified by the microphone, beginning, "Social responsibility as we've defined it requires that we disrupt inequitable institutional and individual practices."

The audio continued for about eighteen seconds until it abruptly stopped. As Adamson adjusted the microphone and attempted to fix the problem, a board member spoke up to tell her that they "need[ed] her public comment but not an audio of someone else's comment." The audio restarted for a few more seconds until it again went silent, this time apparently from the microphone being turned off.

The board members—who sat in front of the speaker's podium at a long desk— remained silent while Adamson tried to fix the microphone. Just as the audio temporarily returned, Riddle approached the podium to help Adamson. After messing around with the phone a while, Riddle held it up to the microphone as the audio played for several more seconds. The board members spoke quietly amongst each other and gestured but did not address Adamson or Riddle. Instead, a security officer came to the podium and allegedly forced them to sit down "and not play the audio."

At this point, Riddle alleges that Holman lamented, "Oh my god. I'm not letting this guy go next." Riddle claims Holman then called several other speakers instead of him even though "he should have been after" Adamson.

Following the comments of two more speakers, Riddle walked to the podium for his turn. Riddle identified himself and stated that he lived in Omaha. He then refused to state his address, saying that information was "irrelevant" and that he was "not required to give it." Holman immediately clarified that it was a "statutory requirement," to which Riddle interrupted to argue that it was "not a state law."

Speaking over Holman, Riddle said, "My time will start now." In response, Holman promptly asked for the podium microphone to be cut. The board members

looked to each other for answers to the predicament and eventually asked for a five-minute recess.  By then, however, Riddle had begun walking around the podium and speaking loudly, continuing on about the equity initiatives and "plead[ing] his case that he should not be silenced."

Holman called on security to remove Riddle just moments later.  Riddle asserts he made efforts to demonstrate "he was not posing a threat" and that Holman therefore removed him "in an effort to prevent exposure of" Thomas.  He also states that the board "arbitrarily" and "selectively" enforced" rules—including the address requirement—on himself and Adamson, presumably in retaliation for their dissenting messages.

Following the August 2nd meeting, Riddle went on to attend other public meetings at which he reports the board more clearly explained the rule regarding the disclosure of speaker's addresses "at the beginning of each meeting."  Riddle learned his lesson and thereafter became compliant with that requirement, even though he views it "as a measure the district uses to chill speech."  For the board's part, Riddle alleges he was barred from accessing "the board's official social media accounts" after expressing his "dissenting views."  In particular, he asserts OPS Superintendent Cheryl Logan, Thomas, and Holman simultaneously blocked him from their accounts.

Riddle also alleges that OPS "conspired with the Omaha Police Department ["OPD"] to intimidate [him] through multiple phone calls and investigations in retaliation for his speech.  Among those complained-of actions is a call from OPD Lieutenant Charles Otto ("Otto"), who manages OPS's school resource officers.  Riddle also says that Holman sought and received a protection order against him "despite the lack of proper evidence, presentation or legal standards."  These events, Riddle claims, are just a fraction of the "deliberate and coordinated effort[s] to silence [him], as well as others who spoke critically of the" board, as he maintains that others who spoke out about controversial topics were harassed as well.

4

Riddle asserts OPS's alleged "extensive pattern of unconstitutional conduct to retaliate [against] and silence" dissenters has violated his rights under the First and Fourteenth Amendments to the United States Constitution. In particular, he believes its actions against him constitute unjustified viewpoint-based discrimination and have deprived him of his right to due process. Riddle also claims OPS engaged in a conspiracy to deprive him of his constitutional rights by coordinating with OPD "to intimidate and retaliate against [him] and others."

Riddle initially brought these claims against OPS in the District Court of Douglas County, Nebraska (Case No. 23cv455, Filing No. 1). After OPS removed the lawsuit to this Court, *see* 28 U.S.C. §§ 1331, 1441, and moved to dismiss his complaint, Riddle voluntarily dismissed the action, *see* Fed. R. Civ. P. 41(a)(1)(A)(i).

Just two weeks later, Riddle brought this action against OPS generally alleging the same claims he raised before. On January 10, 2024, OPS moved to dismiss his complaint pursuant to Rule 12(b)(1) and (6). Riddle opposes dismissal on either ground, asserting "the evidence is black and white" and his complaint should not be dismissed "based on a few well put-together words" (Filing No. 9).

## II.    DISCUSSION
### A.    Standard of Review
#### 1.    Rule 12(b)(1)

Riddle bears the burden of establishing he has standing to bring his claims under Article III of the United States Constitution. *See Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005). "To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged action, and it must be likely that the injury will be redressed by a favorable judicial decision." *Cross v. Fox*, 23 F.4th 797, 800 (8th Cir. 2022) (quoting *Hawse v. Page*, 7 F.4th 685, 688 (8th Cir. 2021)). Riddle's "complaint need not make a large number of allegations relating to the injury suffered: 'general factual allegations of injury

resulting from [OPS's] conduct may suffice' to establish standing." *Young Am. Corp*, 424 F.3d at 843 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 560, 561 (1992)).

OPS's standing argument is limited and appears to make a "facial" attack on Riddle's complaint. *See Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (explaining that a facial attack is one in which the "defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction" (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009))). In analyzing a facial attack, the Court must restrict "itself to the face of the pleadings" and grant "the non-moving party . . . the same protections" given in a Rule 12(b)(6) motion. *Id*. (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).

### 2.     Rule 12(b)(6)

To withstand OPS's Rule 12(b)(6) motion, Riddle's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Powell v. Minn. Life Ins. Co.*, 60 F.4th 1119, 1121-22 (8th Cir. 2023) (quoting *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). The Court construes Riddle's *pro se* complaint liberally and holds it to "less stringent standards than formal pleadings drafted by lawyers." *Rinehart v. Weitzell*, 964 F.3d 684, 687-88 (8th Cir. 2020) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam)). It does not, however, excuse any failure to "comply with substantive and procedural law," *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984), nor the basic requirement that a complaint must "allege sufficient facts to state a facially plausible claim to relief," *Rinehart*, 964 F.3d at 688 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### B.     Standing

OPS briefly argues that Riddle "lacks standing to bring his Section 1983 action to the extent the claim relies on constitutional violations by OPS of other persons' purported

rights." Beyond this assertion, which is sandwiched into OPS's challenge to Riddle's conspiracy claim, OPS launches no further challenges to Riddle's complaint under Rule 12(b)(1).

Certainly, Riddle cannot rely on such third-party allegations alone to establish standing. *See Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (explaining why "[o]rdinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party" (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953))). But those alleged incidents are admissible and important context that aid Riddle in plausibly asserting his § 1983 claims against OPS, which inherently rely on evidence of constitutional violations against others. *See generally Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978); c*f. McDonough v. Anoka County*, 799 F.3d 931, 946 (8th Cir. 2015) (explaining that allegations of procedurally barred incidents "may still be considered in assessing the plausibility of" the plaintiff's claims). The Court is further satisfied that Riddle's allegations regarding actions taken against him meet the "relatively modest" burden to establish Article III standing at this stage. *See Johnson v. Griffin*, 69 F.4th 506, 510 (8th Cir. 2023). OPS's motion for dismissal under Rule 12(b)(1) is therefore denied.

## C. Municipal Liability

Title 42 section 1983 generally provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Municipalities and local governing bodies "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where [] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at

690.   They cannot, however, be held liable based merely on an "employer-employee relationship with" an individual who caused the plaintiff's injury.  *Id.* at 691-92.

For his claims to pass muster, Riddle must therefore allege and eventually prove he has been injured by constitutional violations as a result of "action pursuant to an official [] policy" or unofficial custom of OPS.  *Lee v. Pine Bluff Sch. Dist.*, 472 F.3d 1026, 1029 (8th Cir. 2007) (quoting *Monell*, 436 U.S. at 691); *see also Kiefer v. Isanti County*, 71 F.4th 1149, 1152 (8th Cir. 2023) (stating that "a plaintiff may establish municipal liability if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise" (internal quotation omitted)).  OPS contends that Riddle fails to allege any "OPS policy, custom, or failure to train or supervise its employees that could serve as the moving force behind the alleged constitutional violations" he has suffered.

Riddle argues his allegations are sufficient to "plausibly establish an unofficial policy or custom" under *Monell*.  To allege an unofficial custom giving rise to § 1983 liability, Riddle must eventually be able to show the following: "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom."  *Kiefer*, 71 F.4th at 1153 (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).  Riddle falls short of meeting these requirements as he has failed to adequately allege that OPS employees have engaged in a "continuing, widespread, persistent pattern of unconstitutional misconduct."  *Id.*

Putting aside whether the actions allegedly taken against Riddle himself were unconstitutional, Riddle's allegations regarding any pattern of violations against others are largely too conclusory and vague to eke out a claim of widespread unconstitutional conduct.  *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar

8

constitutional violations by [] employees is ordinarily necessary to demonstrate [the] deliberate indifference" of a municipality.) (internal citation omitted); *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 829 (8th Cir. 2013) (stating that "multiple incidents involving a single plaintiff could establish a 'custom' [only] if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials").   Among those allegations are that (1) the board cut off his mother's microphone "when she attempted to play [Thomas's] statements," (2) the police and board members have "reached out to [others] or their employers for opposing CRT, Mask Mandates, etc.," (3) police "went to search" the house of a student who attended but did not speak at a board meeting, and (4) community members' "repeated requests for various types of information" about OPS policies and programs have gone unanswered.

Even assuming the truth of these allegations, there are a litany of issues that make them deficient to state a claim of an unofficial custom under *Monell*.  First, Riddle does not adduce enough facts to allege these incidents resulted in constitutional violations.  For instance, while Riddle contends officers harassingly attempted to search a student's room after he attended a board meeting, Riddle's description of his call with Otto details that the officers sought the student's consent to search his room.  Importantly, asking an individual for consent to search their person, belongings, or residence does not violate the constitution, and conducting a search pursuant to such consent is frequently permissible. *See United States v. Kennedy*, 35 F.4th 1129, 1134 (8th Cir. 2022) ("Even in the absence of reasonable suspicion, an officer may search an individual where the individual [voluntarily] consents.").  Altogether, Riddle has not alleged enough facts to plausibly allege this conduct, or other actions taken toward third parties, are part of a "persistent pattern of unconstitutional misconduct." *Snider*, 752 F.3d at 1160; *see also Eggenberger v. W. Albany Tp.*, 820 F.3d 938, 942 (8th Cir. 2016) (explaining that the First Amendment does not guarantee a right of access to all government information); *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (stating an individual must be able to show

that an official "took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity" to establish a First Amendment retaliation claim (quoting *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017))).

Second, Riddle's various allegations are not similar enough in nature to each other or to his own alleged injuries to evidence customary conduct of OPS officials. In the absence of proof of a more-official policy, Riddle must generally allege sufficiently similar constitutional violations to demonstrate OPS employees' widespread actions have established an actionable "custom." *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) ("[I]t is usually necessary in *Monell* cases to introduce evidence of a prior pattern of similar constitutional violations."); *Hurd v. D.C.*, 997 F.3d 332, 338 (D.C. Cir. 2021) ("To hold a municipality liable based on a pattern of similar constitutional violations, a plaintiff must show that the municipality 'knowingly ignored a practice that was consistent enough to constitute custom.'" (quoting *Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004))); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 51-52 (D.D.C. 2021) (dismissing the plaintiff's *Monell* claims where their "particular allegations [were] insufficiently similar" to constitute a custom or put the municipal entity on notice of unconstitutional conduct). But Riddle's broad allegations regarding a slew of mismatched complaints—most of which differ greatly from his own experience with OPS officials—are not similar, consistent, or widespread enough to establish OPS had a "standard operating procedure," even if they all constitute arguably retaliatory or censorial behavior. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Johnson v. Harris County*, 83 F.4th 941, 946-47 (5th Cir. 2023) (stating the "specific facts [alleged by the plaintiff] must be similar to the case at hand" and not complain of "any and all 'bad' or unwise acts" (internal citation omitted)).

In light of these deficiencies, Riddle's allegations are insufficient to state a claim against OPS for the complained-of actions of city employees. *See Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181-82 (8th Cir. 1998) (concluding

10

*Monell*'s requirements ensure "that a school district is liable only for those acts which 'may fairly be said to be those of the [district],'" including customs so pervasive they have "the 'force of law'" (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998))).

### D.    Conspiracy

"To prove a § 1983 conspiracy claim, the plaintiff must show that the defendant (1) conspired with others to deprive him or her of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff" resulting in a violation of his constitutional rights. *Helmig v. Fowler*, 828 F.3d 755 (8th Cir. 2016) (quoting *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)); *see also Kingsley v. Lawrence County*, 964 F.3d 690, 702-03 (8th Cir. 2020).  But Riddle "must [also] show that [OPS] itself participated in the conspiracy either through a policy, custom, or action by persons with final decision-making authority" to lodge a cognizable § 1983 conspiracy against it.  *Perryman v. City of Bloomington*, ___ F. Supp. 3d ___, ___, 2023 WL 8374283, at *5 (D. Minn. Dec. 4, 2023) (collecting cases stating a plaintiff must meet *Monell*'s requirements to state a § 1983 conspiracy claim against a municipal entity); *see also Rieves v. Town of Smyrna*, 67 F.4th 856, 866 (6th Cir. 2023) (explaining that "no case law exists to suggest that the standard for *Monell* liability in the conspiracy context differs from the general standard" applicable to § 1983 claims).  For the same reasons stated above, Riddle fails to state a conspiracy claim against OPS itself as his pleadings insufficiently allege a policy or custom underlying any actions taken against him by city employees.

Based on the foregoing,

IT IS ORDERED:

1.    Defendant Omaha Public Schools's Motion to Dismiss pursuant to Rule 12(b)(6) is granted.  OPS's motion is denied in all other respects.

2.    Plaintiff Justin E. Riddle's complaint is dismissed.

3.      A separate judgment will be entered.

Dated this 19th day of April 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge